**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                               )
DAVID DAOUD WRIGHT,            )
                Plaintiff,     )
                               )          Civil Action
v.                             )          No. 21-10137
                               )
ANTONE MONIZ and MELVIN SPRAGUE, )
                               )
                Defendants.    )
_____)
```

**MEMORANDUM AND ORDER**

June 17, 2024

Saris, D.J.

**INTRODUCTION**

Plaintiff David Daoud Wright was incarcerated in Plymouth County Correctional Facility's administrative segregation unit, commonly called "the hole," for thirty-two months. For most of that time, he was a pretrial detainee facing terrorism-related charges. Wright was confined to his solitary cell for twenty-three hours per day, monitored via an in-cell camera, and deprived of most human interaction. Wright alleges Defendants, Superintendent Antone Moniz and Assistant Superintendent Melvin Sprague, imposed these conditions to punish him based on the nature of his charges rather than for any legitimate disciplinary or safety reason.

Wright sues Moniz and Sprague pursuant to 28 U.S.C. § 1983 for violating his procedural and substantive due process rights under the Fourteenth Amendment to the Constitution. Defendants

1

move for summary judgment. As to both claims, they argue Wright filed suit too late, failed to exhaust administrative remedies, and cannot show they were individually responsible. As to Wright's substantive due process claim, Defendants contend they kept him in administrative segregation to protect his safety and that of other prisoners, not to punish him. As to his procedural due process claim, Defendants assert they provided Wright legally adequate procedural safeguards. Finally, they argue qualified immunity shields them from liability. After a hearing and review of the record, the motion for summary judgment (Dkt. 149) is **DENIED** as to Wright's timely procedural due process claims and **ALLOWED** as to his substantive due process claims.

## BACKGROUND

Drawing all inferences in favor of Wright, the Court considers the following facts undisputed unless otherwise noted.

## I.   The Crime

David Daoud Wright is a thirty-four-year-old man currently incarcerated at the Federal Correctional Institution in Terre Haute, Indiana, serving a thirty-year sentence after being convicted of terrorism-related crimes. Wright is a devout Muslim. He is 6'7" and weighed 511 pounds when he was booked.

As background, in May 2015, law enforcement began surveilling Wright and his uncle, Usaamah Abdullah Rahim, regarding suspected terrorist activity. On May 31, 2015, Rahim revealed to Wright and

another person his plan to behead a woman in another state. The morning of June 2, 2015, law enforcement intercepted a phone call in which Rahim told Wright he no longer intended to behead the planned victim, and instead would "go after" the "boys in blue" that day as an act of violent jihad. Dkt. 151-4 at 9-10. Wright instructed Rahim to destroy his electronic devices before law enforcement could access them. Officers confronted Rahim on June 2 and, in the ensuing encounter, fatally shot him. FBI agents arrested Wright later that day. Wright and Rahim's case generated significant media coverage in the weeks following Wright's arrest.

On June 18, 2015, Wright was indicted on charges of conspiracy to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1); conspiracy to obstruct justice in violation of 18 U.S.C. § 371; and obstruction of justice in violation of 18 U.S.C. § 1519. The terrorist group designated in the indictment was the Islamic State of Iraq and the Levant ("ISIL" or "ISIS"). Later, he was indicted on the new charge of conspiracy to commit acts of terrorism transcending national boundaries in violation of 18 U.S.C. §§ 2332b(a)(2) and (c) and another count of obstruction of justice.

## II. **Placement in Solitary Confinement**

### A.   **Initial Assignment**

After his arrest, Wright was incarcerated at Plymouth County Correctional Facility ("Plymouth") in Plymouth, Massachusetts.

Antone Moniz and Melvin Sprague were the Superintendent and Assistant Superintendent of Plymouth throughout Wright's confinement there.

Wright was described on his booking documents as "[a]rmed," "[d]angerous," "[v]iolent," a "[t]errorist," and a "[p]ossible [t]errorist [o]rganization [m]ember" to be treated with caution. Dkt. 151-16 at 2. Wright's intake classification report noted that he was a "high risk transport per [the] superintendent." Id. at 3 (emphasis omitted). Based on Wright's answers to a suicide questionnaire, he was initially placed on a mental health watch until he could be cleared by a mental health professional. Wright was housed in a cell in a protective gown with a camera and an officer right outside the cell. On June 4, 2015, a mental health clinician evaluated Wright and cleared him for housing in administrative segregation.

Sprague assigned Wright to the administrative segregation unit ("AdSeg"), also called "Unit G," pending formal classification. Wright's cell contained an inward-facing camera that monitored him perpetually. Sprague designated Wright with "house-alone" and "rec-alone" status, meaning Wright would live in a single-occupancy cell and spend his recreational time alone rather than with others. Finally, Sprague placed Wright on "one-

on-one watch," meaning a guard would sit directly outside his cell around the clock. The one-on-one watch lasted until June 24, 2015.

On June 10, a panel comprised of Unit G Captain John Hickey, Assistant Deputy Superintendent ("ADS") of Classification Derek Webb, and Caseworker Elena Brady conducted an initial "Classification Review" and formally assigned Wright to AdSeg rather than general population. The panel's stated reason for doing so was "maintain[ing] the safe, secure, and orderly running of the facility." Dkt. 151-32 at 2. Moniz later testified that Wright was classified to AdSeg because of "what he did," in other words, "his alleged crime that he had not yet been convicted of." Dkt. 159-3 at 200:20-23. Parties dispute whether Wright was placed in solitary confinement to secure his and others' safety or to punish him for his alleged crimes.

**B.  Conditions**

Inmates in AdSeg faced greater restrictions than those in general population. People in AdSeg were confined to their cells for twenty-three hours per day, with one hour of recreational time outside their cells, while those in general population had multiple recreational periods totaling about eight hours per day. During recreation, those in AdSeg could interact with each other only through cell doors or, if their recreational hours lined up, on the recreation yard. There was no access to television. By contrast, inmates in general population could socialize in

communal recreational spaces and watch television together. Individuals in general population could eat and attend religious services communally, but individuals in AdSeg ate alone in their cells and could seek only one-on-one visits with a clergy. Those in general population could access discovery materials related to their legal proceedings inside their cells; those in AdSeg could not. General population contained no camera cells. And although general population included its own protective custody unit, inmates there enjoyed the same recreational schedule as the rest of general population and generally lived in open dormitory-style arrangements rather than individual cells.[1]

Wright was subject to additional restrictions beyond the baseline in AdSeg. Wright was on one-on-one watch, albeit only for the first few weeks of his incarceration, meaning that during that time there was always a guard directly outside his cell. Although Unit G contained a mix of single-bunk and double-bunk cells, and general population ordinarily housed inmates in two-man, four-man, or five-man cells, Wright lived in a solitary cell throughout his confinement. Because he was on rec-alone status, Wright was never able to interact with other individuals in Unit G face to face,

---

[1] The First Circuit has held that conditions materially identical to those in Plymouth's AdSeg constituted "solitary confinement." See Perry v. Spencer, 94 F.4th 136, 144 (1st Cir. 2024) (en banc); see also Davis v. Ayala, 576 U.S. 257, 286 (2015) (Kennedy, J., concurring) (equating "administrative segregation" and "solitary confinement").

even during recreational time. In his camera cell, Wright was subject to constant surveillance, including when he used the toilet, notwithstanding his religious concerns about modesty. Moreover, Wright was strip-searched every time he left his cell to review his discovery documents or to talk to his imam. As a result, Wright eventually stopped seeking to speak to the imam.

Some of the restrictions placed on Wright were atypical even for an inmate in AdSeg. The majority of those in Unit G were there for disciplinary violations. Hickey stated that it was not "typical to keep an inmate in a camera cell throughout their entire stay." Dkt. 159-1 at 63:17-20. Likewise, Webb testified it was not "typical that a new inmate with no criminal history would be assigned to one-on-one watch." Dkt. 159-2 at 108:6-9. Plymouth policy dictated that no one could be kept in AdSeg continuously for over thirty days per disciplinary violation. As explained below, Wright was held in AdSeg for a total of thirty-two months.

### C.   Classification Review

Wright received periodic reviews of his initial classification. Every week, a Classification Board that included Hickey, a caseworker, and others reviewed the confinement of every inmate in Unit G. These weekly meetings lasted "anywhere from 20

minutes to an hour and 10" minutes for all inmates combined. Dkt. 159-7 at 47:1-12.

The Board provided Wright a written notice of his classification decision, referred to as a "receipt," after his first two months in AdSeg and again every month thereafter. Each receipt stated Wright was in AdSeg "[f]or the safe, secure, and orderly running of the institution," and that he "ha[d] the right to appeal an unfavorable classification recommendation decision through [his] Caseworker." See, e.g., Dkt. 151-36 at 2. From June 2015 to November 2016, he signed those receipts indicating he did not want to appeal the classification decision. After November 1, 2016, Wright stopped signing the receipts altogether.

The Board held a formal classification hearing, for which Wright received notice forty-eight hours in advance, every three months. Significantly, Plymouth's notice forms included checkboxes indicating when an inmate was allowed to "attend the hearing and make a presentation verbally and/or in writing to the Board," or was not permitted to attend but could instead "submit a written presentation for the Board's consideration." See, e.g., Dkt. 151-36 at 3. These boxes were not checked on Wright's notices. He was not invited to participate in his classification hearings. The final notice Wright received, dated October 17, 2017, did not list a hearing date.

Defendants were not on the Classification Board and did not participate directly in reviewing Wright's assignment to AdSeg. However, Sprague testified that he "put [Wright] in segregation," that he was "one of the decision makers" responsible for Wright being kept in AdSeg "throughout his confinement," and that Moniz was "another one of those decision makers." Dkt. 159-8 at 200:4-17. Sprague also testified it was his decision that "Wright be kept in a camera cell throughout his confinement at PCCF." Id. at 200:18-21. Hickey called classification reviews "joint decision[s]" between himself and the other members of the Classification Board, "with support from [his] supervisors." Dkt. 164-1 at 145:16-146:2. He further stated that "[i]f the classification board wanted to move Mr. Wright to [general] population but . . . [Defendants] did not," the Board would not do so. Dkt. 159-1 at 105:21-106:4. According to Hickey, Defendants "ha[d] more involvement regarding classification decisions" for high-profile inmates. See id. at 132:11-20.

### III. **Wright's Efforts to Leave Solitary Confinement**

In AdSeg, Wright was a "model inmate." Dkt. 158 at 73. He maintained mostly positive relationships with other inmates to the extent he was able to communicate with them through vents between cells or through cell doors. Others described Wright as "polite and cooperative," "friendly," and "pleasant and respectful." Id.

Moniz called Wright "a complete gentleman." Dkt. 159-3 at 101:2-8. Wright was not subject to any discipline at Plymouth.

Hickey testified he and Wright had "lengthy discussions regarding [Wright's] confinement" and Wright raised the possibility of going to general population "probably four or five times." Dkt. 159-1 at 99:17-101:3. Wright also communicated with Moniz and other Plymouth officials regarding his conditions of confinement. These interactions are summarized below.

### A.   August 2015 to November 2016

#### 1.   *Conversations with Hickey and Moniz*

Wright spoke to Hickey in August 2015 regarding his placement in solitary confinement and his access to religious services. On October 21, 2015, Hickey emailed Defendants stating that Wright was "approaching five months in Unit G," had shown "no issue[s] at any point during his stay," did "not present with any mental health issues," and was "no longer in the news." Dkt. 151-39 at 2. Hickey asked whether "we" -- referring to himself and Defendants -- were "going to consider [general] population at any point." Id. Moniz responded that he could "not support putting an alleged terrorist in general population" because of "concern[s] for his safety." Id. Hickey forwarded Moniz's response to Lieutenant Robert Kuzia, Jr. and Brady, who were on the Classification Board at the time, so they could "see the response from the superintendent" as "[p]art of the classification discussion." Dkt. 159-1 at 143:1-12. After

that, "it was decided that Mr. Wright would remain in AdSeg."
Dkt. 164-1 at 144:14-17. In another conversation, Moniz told
Hickey he opposed placing Wright in general population out of
concern that "a cowboy or a Marine or a former police officer"
might harm him. Dkt. 159-1 at 157:11-15.

Wright recalls speaking to Moniz during an administrative
walkthrough in January 2016. Wright asked if he could move into
general population or, at the very least, into a non-camera cell.
Moniz refused his requests. And on April 14, 2016, Hickey emailed
Defendants stating Wright had "request[ed] to live in a two man
cell." Dkt. 151-40 at 2. Moniz responded that he would oppose
Wright having a cell mate "[f]or the same reason that he [wa]s in
segregation." Id.

    *2.   Letters to Moniz About the Unit Worker*

From January to October 2016, Wright wrote four letters to
Moniz complaining about a "unit worker," a fellow inmate with
additional duties within the subunit. See Dkt. 151-42. Wright
alleged the unit worker had been antagonizing and sexually
harassing Wright and others in his cell block. Wright alleged the
unit worker had sexually harassed him by telling him, among other
things, to "suck his dick." Dkt. 151-43 at 3. Wright also revealed
the unit worker and a former inmate had been "run[ning] their
mouths" about his case, saying things like "F you, ISIS" and "Go
to hell, ISIS," but that he had otherwise "not had any problems or

issues with either staff or inmates." Id.; Dkt. 151-2 at 295:3-11. The letters did not request review of Wright's classification.

ADS Michael Duggan, an officer responsible for prisoner complaints in AdSeg, published a report on August 16, 2016, finding Wright's allegations of sexual harassment were substantiated. Wright also filed grievances in September and October 2016 regarding the unit worker's alleged misconduct, but neither grievance asked for review of Wright's classification. Other inmates occasionally called Wright a "terrorist," but he never reported facing any specific threats to his safety.

### 3. Request for Protective Custody

Because of Wright's continuing concerns about the unit worker, Hickey, Duggan, and others determined that "Wright and [the unit worker] would benefit from being in separate sub[-]units." Dkt. 159-13 at 2. On November 1, 2016, Hickey told Wright that he would be moving to another cell that was also a camera cell but was not as large as Wright's current one. According to Hickey's report, "[i]t was apparent" that Wright did not want to move to that cell. Id. After Hickey delivered the news, Wright requested protective custody, which he understood would allow him to stay in his current cell. Hickey informed Moniz of Wright's request, Webb reviewed and approved it, and Wright ultimately did not move cells. Wright's stated reason for requesting protective custody was his "[h]igh profile case." Dkt. 151-44 at 2.

**B.    November 2016 to April 2017**

　　*1.    Continuing Issues With Unit Worker*

Wright wrote a final letter to Hickey on April 14, 2017, regarding the unit worker. In response, investigators met with Wright for an hour on April 18 to discuss his complaints. During this interview, one investigator asked Wright "if he would consider being transferred to another facility where he might be able to live in [general] population." Dkt. 151-30 at 7. Wright responded that he was "good right where [he was] at," and that the unit worker should have to move, not Wright. Id. On April 21, Wright wrote a letter to the Department of Correction reiterating the same complaints about the unit worker, but not raising any concerns with his classification. See Dkt. 151-45. At some point, he also wrote to a Department of Justice official voicing the same issues.

　　*2.    Challenging Placement in Solitary and Camera Cell*

On April 21, 2017, Wright filed his first (and only) grievance regarding his classification and conditions of confinement. In his grievance form, he requested "immediate reclassification out of AdSeg [any/all unwarranted camera cells]." Dkt. 151-51 at 2 (emphasis omitted). Hickey forwarded Wright's grievance to Defendants and asked them for their "thoughts on this matter." Dkt. 151-52 at 4-5. Moniz told another officer to "cut and paste something for [Hickey] out of [the] policy" and noted that if Wright appealed, Moniz would "be looking at this as well." Id.

Hickey then responded to the grievance by suggesting that Wright should "write a formal request" if he "wish[ed] to have the Protective Custody designation removed and the committee [to] examine [his] request." Dkt. 151-51 at 2-3. Captain Mark Holmes approved Hickey's response, stating that Wright could "write a formal request to have the protective custody designation removed." Id. at 3. Wright neither appealed the denial of his grievance nor formally asked to remove his protective custody designation.

### C.   April 2017 to January 2018

On October 18, 2017, after a multi-week trial, a jury found Wright guilty of all five counts in the superseding indictment. He was sentenced on December 19, 2017, to twenty-eight years in prison, and remained at Plymouth awaiting transfer to a federal prison. Authorities moved Wright out of Plymouth and into a federal facility the morning of January 26, 2018. Wright's conviction for conspiracy to provide material support to ISIS was later vacated, but he was re-sentenced to thirty years in prison and a lifetime of supervised release. The First Circuit affirmed his thirty-year sentence. United States v. Wright, 101 F.4th 109 (1st Cir. 2024).

Ultimately, Wright was incarcerated at Plymouth from June 3, 2015, until January 26, 2018, for a total of thirty-two months. He spent the entire time in solitary confinement in Unit G. For the first twenty-nine months -- from his initial detention until his

criminal conviction on October 18, 2017 -- he was a pretrial detainee. Wright spent all thirty-two months under camera surveillance and on house-alone, rec-alone status.

## LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir. 2018) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). A material fact is one with the "potential of changing a case's outcome." Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018).

In general, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990). Once it has made the requisite showing, the burden shifts to the nonmovant to "present definite, competent evidence to rebut the motion" and demonstrate that a "trialworthy issue persists." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal citations

and quotations omitted). "The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." Carlson v. Univ. of New Eng., 899 F.3d 36, 43 (1st Cir. 2018).

## DISCUSSION

### I.   Statute of Limitations

Defendants assert that Wright's due process claims are barred by the statute of limitations. The relevant statute of limitations is three years. See Nieves v. McSweeney, 241 F.3d 46, 51 (1st Cir. 2001) (citing Mass. Gen. Laws ch. 260, § 2A). Wright filed his complaint on January 26, 2021, so Defendants contend he may only recover for constitutional violations on or after January 26, 2018, the day he was transferred out of Plymouth. However, Wright argues that the Massachusetts Supreme Judicial Court tolled the statute of limitations for a period during the COVID-19 pandemic, and also that the "continuing violation doctrine" allows him to recover for conduct outside the limitations period.

State law generally governs tolling in § 1983 cases. See Benitez-Pons v. Commonwealth of P.R., 136 F.3d 54, 59 (1st Cir. 1998). Starting in March 2020, the Massachusetts Supreme Judicial Court issued a series of orders tolling "[a]ll civil statutes of limitations . . . from March 17, 2020, through June 30, 2020" because of the exigent circumstances created by the COVID-19 pandemic. See Shaw's Supermarkets, Inc. v. Melendez, 173 N.E.3d

356, 359 (Mass. 2021). These "tolling orders apply to section 1983 actions." Silva v. City of New Bedford, 602 F. Supp. 3d 186, 198 (D. Mass. 2022) (collecting cases). Accordingly, Wright's claims were tolled from March 17, 2020, until June 30, 2020, so he may recover for constitutional violations occurring on or after October 12, 2017.

Wright also argues the "continuing violation doctrine" allows him to recover for constitutional violations during his entire term in solitary confinement, not only the portion within the limitations period. The continuing violation doctrine permits a plaintiff to recover for "acts that otherwise would be time-barred so long as a related act fell within the limitations period." Torres-Estrada v. Cases, 88 F.4th 14, 24 (1st Cir. 2023) (quoting Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009)). However, the doctrine covers only causes of action that "by their very nature require repeated conduct to establish an actionable claim, such as hostile work environment claims." Ayala v. Shinseki, 780 F.3d 52, 57 (1st Cir. 2015) (citing Tobin, 553 F.3d at 130)). It does not apply to "discrete acts" -- even repeated ones -- that occurred on specific dates. Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 33-34 (1st Cir. 2009).

Wright argues he has produced evidence of a continuing violation of his procedural due process rights. A discrete due process claim accrues "each time that a defendant fails to provide

an inmate with the notice, hearing, or evaluation to which he is entitled after a liberty interest attaches." Gonzalez v. Hasty, 802 F.3d 212, 223 (2d Cir. 2015). Thus, even if each review (or lack thereof) violated Wright's rights, collectively, they did not amount to a "continuing violation." Id. (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-15 (2002)). Wright cannot recover for untimely procedural due process violations.

However, the continuing violation doctrine may apply to Wright's substantive due process claim. Wright was confined in AdSeg continuously for over twenty-nine months as a pretrial detainee, including for at least six days -- from October 12, 2017, to his conviction on October 18, 2017 -- into the statutory period. Substantive due process claims challenging pretrial conditions "by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment," cf. Gonzalez, 802 F.3d at 220, that is, when restrictions become "disproportionate to, or not reasonably related to, a legitimate, non-punitive goal," see Ford v. Bender, 768 F.3d 15, 24 (1st Cir. 2014); cf. Reaves v. Dep't of Corr., 333 F. Supp. 3d 18, 22 n.3 (D. Mass. 2018) (applying the continuing violation doctrine to an Eighth Amendment conditions-of-confinement claim).[2]

---

[2] Wright alleges Defendants violated his substantive due process right not to be punished during pretrial detention. His pretrial detention ended on October 18, 2017, when he was convicted. Both

Wright does not challenge his initial placement. Rather, he argues the conditions and duration of his continued pretrial detention in solitary confinement were disproportionate to any legitimate justification. Accordingly, if Wright can prove his solitary confinement violated his substantive due process rights, and that violation continued past October 12, 2017, he can recover for time Defendants kept him in solitary confinement without a legitimate justification prior to his conviction on October 18, 2017.

## II.  **Exhaustion**

Defendants assert they are entitled to summary judgment because Wright "did not fully and properly exhaust his administrative remedies." Dkt. 150 at 10. The Prison Litigation Reform Act ("PLRA") requires incarcerated people to exhaust all "available" prison administrative procedures before filing suit. Jones v. Bock, 549 U.S. 199, 204 (2007) (citing 42 U.S.C. § 1997e(a)). However, if "an administrative remedy, although officially on the books, is not capable of use to obtain relief,"

---

parties refer to thirty-two months of confinement rather than twenty-nine, but neither has articulated what constitutional standard should apply to Wright's continued confinement in AdSeg between conviction and sentencing. The Court need not address the proper standard because it was not briefed.

it is not "available," and the exhaustion requirement does not apply. Ross v. Blake, 578 U.S. 632, 643 (2016).

"[F]ailure to exhaust is an affirmative defense" for which defendants bear the initial burden of proof. Jones, 549 U.S. at 216. Parties agree Wright did not attempt to exhaust the administrative procedures at Plymouth, so Defendants have met their burden. The burden shifts to Wright to present facts showing administrative remedies were unavailable to him. See Hubbs v. Suffolk Cnty. Sheriff's Dep't, 788 F.3d 54, 59 (2d Cir. 2015); see also Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez, 659 F.3d 42, 50 n.10 (1st Cir. 2011) (applying a burden-shifting framework to an affirmative defense on summary judgment).

Courts treat an administrative remedy as unavailable if it "operates as a simple dead end," with "officers unable or consistently unwilling to provide any relief to aggrieved inmates." Ross, 578 U.S. at 643-44. According to Wright, Defendants' own statements show that grievances and administrative appeals would have led to a "dead end." Sprague testified he initially placed Wright in a solitary camera cell solely because of Wright's charges. See Dkt. 159-8 at 147:3-18, 198:21-24. Likewise, Moniz testified Wright was kept under those conditions for his entire stay because of the "nature of his charges." See Dkt. 159-3 at 155:2-5; see also id. at 201:11-15 ("Q: Nothing else

could get him moved out of AdSeg? A: His charges kept him in AdSeg, his charges and his plan that was exposed in the media as well as press releases."). Moreover, when Hickey asked Defendants in October 2015 if they would support placing Wright in general population because he had behaved well and his case's media coverage had subsided, Moniz replied that he could "not support putting an alleged terrorist in general population" because of safety concerns. Dkt. 151-39 at 2. A jury presented with this evidence could reasonably infer that even if Wright had fully grieved and appealed the conditions of his confinement, Defendants would not have provided him relief.

Defendants counter that "there is no 'futility exception' to the PLRA exhaustion requirement." See Dkt. 150 at 8 (quoting Medina-Claudio v. Rodríguez-Mateo, 292 F.3d 31, 35 (1st Cir. 2002)). Their reliance on Medina-Claudio is misplaced. There, the plaintiff claimed that administrative procedures were not "available" because they "could not afford him the relief he [sought] in federal court." Id.; see also Booth v. Churner, 532 U.S. 731, 739 (2001) (confirming "Congress meant to require procedural exhaustion regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible"). Here, Wright argues not that administrative procedures at Plymouth would have provided the wrong type of relief, but that they would have provided no relief at all. See Ross, 578 U.S. at 643 ("The

modifier 'available' requires the possibility of some relief."
(cleaned up)). Defendants are not entitled to summary judgment
based on Wright's failure to exhaust administrative remedies.

## III. **Defendants' Individual Responsibility**

Defendants argue they cannot be held liable for Wright's
conditions of confinement because the Classification Board, on
which neither of them sat, made all classification decisions. To
sue under § 1983, a plaintiff must show that his injury resulted
either "from the direct acts or omissions" of the defendant
officials, "or from indirect conduct that amounts to condonation
or tacit authorization." See Grajales v. P.R. Ports Auth., 682
F.3d 40, 47 (1st Cir. 2012). A plaintiff can meet that standard by
showing the defendants "set[] in motion a series of acts by others"
which the defendants knew or reasonably should have known "would
cause others to inflict the constitutional injury." See Ocasio-
Hernández v. Fortuño-Burset, 640 F.3d 1, 16 (1st Cir. 2011)
(quoting Sanchez v. Pereira-Castillo, 590 F.3d 31, 50 (1st Cir.
2009)). Wright argues that although Defendants did not sit on the
Classification Board, they are responsible for placing him in
AdSeg, imposing additional restrictions (i.e., camera cell, house-
alone, and rec-alone statuses), and subsequently intervening in

the Board's process to prevent meaningful review of his classification. Dkt. 157 at 19-20.

There is evidence both Defendants were aware of, and approved, Wright's classification and conditions of confinement. Parties do not dispute that Sprague initially confined Wright to a solitary camera cell with one-on-one-watch status. Sprague said both he and Moniz were "decision makers" responsible for Wright being kept in AdSeg in a camera cell "throughout his confinement" Dkt. 159-8 at 200:10-14, 200:18-21. Similarly, Sprague stated he was responsible for keeping Wright in a camera cell "throughout his confinement." See id. at 200:18-21.

The record also supports a reasonable inference that Defendants influenced Wright's classification reviews. Hickey stated that although Defendants were not formally "responsible for classification decisions," reviews were "joint decision[s]" made by the Board "with support from [his] superiors," particularly for high-profile inmates like Wright. Dkt. 164-1 at 131:5-20, 145:16-146:2. And after Moniz told Hickey he would "not support putting an alleged terrorist in general population," Hickey forwarded Moniz's message to other members of the Board because he wanted them to know Moniz's stance "as part of the . . . classification board reviews." Dkt. 151-39 at 2; Dkt. 159-1 at 143:6-16. Subsequently, "it was decided that Mr. Wright would remain in AdSeg," despite other members of the Board wanting to give

"consideration" to the idea of moving Wright to general population. Dkt. 164-1 at 144:14-15:2. A reasonable jury could find on these facts that Defendants influenced the Classification Board's decisions knowing that doing so would cause Wright's continued solitary confinement.

## IV.  **Procedural Due Process**

Wright argues Defendants stymied meaningful review of his classification in violation of his procedural due process rights. To state a Fourteenth Amendment procedural due process claim, a plaintiff must "identify a protected liberty or property interest" and show the defendants deprived him of that interest "without constitutionally adequate process." Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006). There is no dispute that Wright's solitary confinement implicated a protected liberty interest. See Wilkinson v. Austin, 545 U.S. 209, 214, 224 (2005) (recognizing a liberty interest where inmates were held in individual cells for twenty-three hours per day, provided limited recreational opportunities, required to eat alone inside their cells, and afforded only "rare" noncontact visits). Rather, Defendants argue Wright received weekly reviews, monthly notices, and trimonthly hearings as required by law. Wright counters that he did not receive adequate notice or opportunity to participate in his hearings, and that periodic reviews of his classification

were not sufficiently "meaningful" to pass constitutional muster. Dkt. 157 at 14-15.

The Supreme Court has held that people placed in solitary confinement "in a manner that implicates a liberty interest must be afforded" at least "notice of the factual basis for the confinement and an opportunity to present the inmate's views to the official charged with the decision to confine the inmate." Perry v. Spencer, 94 F.4th 136, 160-61 (1st Cir. 2024) (en banc) (cleaned up) (first quoting Wilkinson, 545 U.S. at 229; and then quoting Hewitt v. Helms, 459 U.S. 460, 476 (1983)). Wright's hearing notices indicated he could neither "attend the hearing and make a presentation verbally and/or in writing to the Board," nor "submit a written presentation for the Board's consideration." See, e.g., Dkt. 151-36 at 3. A reasonable jury could conclude that Wright had no opportunity to advocate for himself during classification proceedings.

Defendants argue Wright had a right to appeal his classification, which he chose not to exercise. But the record demonstrates classification appeals were never successful. See Dkt. 159-2 at 68:6-13 (Webb testifying that he never "reconsidered and changed" an inmate's classification level); Dkt. 159-6 at 111:14-15 (Brady stating she could not "recall a successful appeal"). Thus, a jury could conclude that classification appeals

did not constitute sufficient opportunities to be heard. See Perry, 94 F.4th at 161-62.

Finally, Defendants argue they are entitled to qualified immunity on the procedural due process claim. Qualified immunity shields government officials from suit for damages unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020) (quoting Dist. of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018)). Whether a right is clearly established "encompasses two questions: whether the contours of the right, in general, were sufficiently clear, and whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." See Ford, 768 F.3d at 23 (citing Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)).

As noted above, a jury could reasonably find that Defendants violated Wright's procedural due process rights by failing to provide him with an adequate opportunity to be heard regarding his classification. So, the critical question is whether Wright's procedural rights were "clearly established" as of October 12, 2017, the starting point of the limitations period.

Defendants argue they "reasonably could have believed that the process [Wright] received protected his procedural due process rights." Dkt. 150 at 20. In support, Defendants contend Moniz

implemented Plymouth's policy (PCCF 421) governing periodic review for those in AdSeg and complied with the Massachusetts Supreme Judicial Court's decision in <u>LaChance v. Comm'r of Corr.</u>, 978 N.E.2d 1199, 1201 (Mass. 2012) (holding that the inmate's ten-month administrative segregation in the special management unit on awaiting action status, "during which he had the benefit of only informal status reviews," was unlawful). But PCCF 421 allows for an inmate to "offer a verbal or written statement" at his hearing "and/or submit documentation to contest the rationale for his placement in administrative segregation." <u>See</u> Dkt. 151-33 at 13 (detailing hearing requirements when confinement continues for ninety days or more). Likewise, in <u>LaChance</u>, the Supreme Judicial Court held that the federal and state Due Process Clauses require prison officials to provide an inmate confined to administrative segregation, among other things, a "hearing at which he may contest the asserted rationale for his confinement." <u>LaChance</u>, 978 N.E.2d at 1206-07. PCCF 421 and <u>LaChance</u> unambiguously require that an inmate in solitary confinement have an opportunity to be heard.

Most importantly, the Supreme Court has long held that the Due Process Clause requires a person placed in solitary confinement to receive at least notice and an "opportunity to present his views to the prison official charged with deciding whether to transfer him" there. <u>Hewitt</u>, 459 U.S. at 476, <u>overruled on other grounds</u>, <u>Sandin v. Conner</u>, 515 U.S. 472, 483 (1995). The touchstone of this

right is the "fair opportunity for rebuttal" of the prison decisionmaker's rationale. See Wilkinson, 545 U.S. at 226. A reasonable jury could find that Wright's right to receive a "fair opportunity for rebuttal" was clearly established, and that Defendants violated that right by never allowing him to participate in his hearings. Id. Accordingly, Defendants are not entitled to summary judgment on qualified immunity on the procedural due process claim. Their motion is denied as to Wright's timely procedural due process claims but is allowed as to those arising prior to October 12, 2017, which are barred by the statute of limitations.

## V.   **Substantive Due Process**

Wright alleges Defendants subjected him to severe conditions in pretrial detention to punish him for his charges, in violation of his substantive due process rights. "[A] pretrial detainee has a substantive due process right to be free from punishment." See Ford, 768 F.3d at 24-25 (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)). The Supreme Court has long recognized "a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." Bell, 441 U.S. at 537. Whether conditions of confinement constitute "punishment" hinges on whether officials imposed them "for the purpose of punishment." Id. at 538 (emphasis added). "Absent a showing of an expressed intent to punish," id., courts

infer punitive intent where restrictions placed on a pretrial detainee are "disproportionate to, or not reasonably related to, a legitimate, non-punitive goal," Ford, 768 F.3d at 24 (citing Bell, 441 U.S. at 538-39). "Bell's analysis broadly encompasses the circumstances of all restraints placed on a pretrial detainee," including the "duration of the punitive conditions. . . . not merely the decision to impose them." Williamson v. Stirling, 912 F.3d 154, 180 (4th Cir. 2018) (citing Bell, 441 U.S. at 536-38, 543).

Courts must be mindful that "[e]nsuring security and order at [an] institution is a permissible nonpunitive objective, whether the facility houses pretrial detainees, convicted inmates, or both." Bell, 441 U.S. at 561 (citation omitted). Thus, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response" to the administrative considerations, courts "ordinarily defer to their expert judgment" regarding policies they deem necessary "to preserve internal order and discipline and to maintain institutional security." See id. at 540 n.23 (quoting Pell v. Procunier, 417 U.S. 817, 826 (1974)); id. at 547.

Defendants argue they kept Wright in a camera cell in solitary confinement with no television and minimal recreation for his safety and the safety of officers and other inmates. They claim that because of the "the extensive media coverage" regarding

Wright's "terrorism offenses," which included a plot to "go after" the "boys in blue," they feared that other inmates might attack Wright and that Wright might attack guards. Dkt. 150 at 13-15. They point to Wright's request for protective custody on November 1, 2016, after his harassment by the unit worker. They also note that Wright had the same access to visits as general population inmates.

Wright's conditions of confinement and the safety concerns that supposedly justified them must be analyzed over the long course of his incarceration, during which officials gained more information about him. Given the deference accorded to prison officials to protect the institution's security, no reasonable jury could find that Defendants' initial decision to place Wright in solitary confinement with a camera cell and on one-on-one watch showed punitive intent. When Wright first arrived at Plymouth, his booking documents described him as a violent, dangerous, and high-risk terror suspect. Defendants' choice to sequester Wright from other inmates and monitor him to ensure he did not harm himself or others was reasonably related to legitimate safety concerns. Moreover, beginning with his initial confinement until November 1, 2016, Wright consistently signed his monthly notices indicating

that he did not want to appeal his classification. And Wright himself asked for protective custody on November 1, 2016.

But a reasonable jury could find that after Wright filed a grievance on April 21, 2017, his continued placement in a solitary camera cell became excessive. Defendants had developed an understanding over time that Wright was neither dangerous nor at specific risk of danger. By all accounts, he was a "model inmate" and maintained mostly positive relationships with other inmates. Wright never posed a threat to Plymouth staff, who described him as "polite and cooperative," "friendly," and "pleasant and respectful." Dkt. 158 at 21. Even Moniz called Wright "a complete gentleman." Dkt. 159-3 at 101:2-8. There was no evidence Wright was experiencing any ongoing threats by other inmates, and Wright's request to leave AdSeg and his camera cell indicated he no longer believed he needed protective custody. Defendants' argument that restricting Wright's access to television reduced the risk of other inmates housed near him learning about his case strains credulity since the publicity surrounding his case had subsided. A reasonable jury could find that between April 21, 2017, when Wright asked to be removed from AdSeg and placed in a non-camera cell, and October 18, 2017, when he was convicted, Wright's continued solitary

confinement exceeded any real security risk and constituted punishment in the constitutional sense.

However, Defendants argue qualified immunity protects them from liability. To overcome qualified immunity, Wright must show "(1) [Defendants] violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Irish, 979 F.3d at 76 (quoting Wesby, 583 U.S. at 62-63). Having found that a reasonable jury could conclude Defendants violated Wright's substantive due process right, the Court asks if that right was "clearly established" as of April 21, 2017.

For a right to be clearly established, the law must make "the contours of the right" clear enough that "under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." Ford, 768 F.3d at 23. A plaintiff can show a right was established "when it is dictated by controlling authority or a robust consensus of cases of persuasive authority," which "does not require the express agreement of every circuit and can be established by sister circuit law." Perry, 94 F.4th at 164 (cleaned up). Defendants argue they cannot be held liable for "advanc[ing] legitimate government interests without clear guidance" from the courts. See Dkt. 150 at 19.

The Supreme Court has held since 1979 -- and the First Circuit has affirmed repeatedly -- that prison officials cannot impose a

condition of confinement on a pretrial detainee with the intent to punish him, no matter how serious the alleged crimes. See Bell, 441 U.S. at 535; Ford, 768 F.3d at 24; Surprenant v. Rivas, 424 F.3d 5, 13 (1st Cir. 2005). Moreover, the First Circuit and other circuits have held that keeping a pretrial detainee in administrative segregation for comparable or even smaller amounts of time amounted to punishment. See, e.g., Surprenant, 424 F.3d at 13-14 (accepting that arbitrary placement in administrative segregation for thirty days could constitute punishment); Covino v. Vt. Dep't of Corrs., 933 F.2d 128, 130 (2d Cir. 1991) (per curiam) (holding that although confining the plaintiff to an isolation block initially may have "violated no protected constitutional right," at "some point, however, the administrative necessity for involuntary lock-up beg[an] to pale" and "after nine months, it smack[ed] of punishment"); Dilworth v. Adams, 841 F.3d 246, 253 (4th Cir. 2016) (finding "85 days . . . in disciplinary segregation . . . confined to [a] cell for 23 hours each day and denied all personal contact except with attorneys or clergy" could constitute punishment); cf. Lock v. Jenkins, 641 F.2d 488, 491-92 (7th Cir. 1981) ("This court finds it appropriate to consider together all the conditions of confinement in order to determine whether they meet the [Bell] test of amounting to punishment."). In Williamson v. Stirling, a case similar to this one, the Fourth Circuit held that "a reasonable factfinder could conclude" the

plaintiff's "three-and-a-half years of solitary confinement" as a pretrial detainee "were so excessive relative to his infractions" -- "a single incident of unrealized and unrepeated threats" -- that he "suffered unconstitutional punishment in violation of his substantive due process rights." See 912 F.3d at 179, 181.

But neither the Supreme Court nor the First Circuit has squarely held that assigning a high-profile terrorism suspect to solitary confinement in order to protect him violates his substantive due process rights. After all, even a model inmate can be attacked while awaiting trial where knowledge of the terrorism charges is widespread in the prison. Absent a showing of expressly punitive intent, other circuits have "upheld the placement of pretrial detainees in Administrative Segregation . . . for purposes of the detainees' protection." See, e.g., Almighty Supreme Born Allah v. Milling, 876 F.3d 48, 58 (2d Cir. 2017) (first citing Cabral v. Strada, 513 F. App'x 99, 103 (2d Cir. 2013) (unpublished decision); then citing Taylor v. Comm'r of N.Y.C. Dep't of Corrs., 317 F. App'x 80, 82 (2d Cir. 2009)). Wright can point to no Supreme Court or First Circuit caselaw indicating that as of 2017, a reasonable prison official would know that keeping him in prolonged solitary confinement in a camera cell for his protection was so excessive as to violate his substantive due process rights. Thus, Defendants are entitled to qualified

immunity and their motion for summary judgment is allowed as to Wright's substantive due process claims.

**ORDER**

Defendants' Motion for Summary Judgment (Dkt. 149) is **DENIED** as to Wright's procedural due process claims arising after October 12, 2017. The Motion is **ALLOWED** as to his substantive due process claims under the doctrine of qualified immunity.


SO ORDERED.

/s/  PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge